# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

CATHIE FAULKNER,                    )
                                    )
                Plaintiff,          )
                                    )
        v.                          )        1:06CV00369
                                    )
TYCO ELECTRONICS CORPORATION,       )
                                    )
                Defendant.          )

## MEMORANDUM OPINION AND ORDER

**Eliason, Magistrate Judge**

This case comes before the Court on Defendant's motion for summary judgment pursuant to Fed. R. Civ. P. 56. Plaintiff filed the present action in Guilford County Superior Court alleging (1) wrongful discharge because of her sex in violation of the North Carolina Equal Employment Practices Act ("EEPA"), N.C.G.S. § 143-422.2, (2) intentional infliction of emotional distress, and (3) negligent infliction of emotional distress. Defendant subsequently removed the case to this Court based on diversity of citizenship jurisdiction.

The underlying facts, in the light most favorable to Plaintiff, are as follows. Defendant employed Plaintiff from March 2004 until April 12, 2005, most recently as a stamping press operator. (Compl. ¶ 3.) Prior to this period, Defendant's predecessor employed Plaintiff for a number of years without incident. The first signs of trouble between the parties emerged in March 2005, when two of Plaintiff's co-workers, Anthony Owens

and Rodney Waddell, reported that Plaintiff was spreading rumors about Waddell. (Pl.'s Dep. pp. 64-65; Watts. Aff.) As a result of this report, supervisor Jay Watts ("Watts") and Keisha Chapman ("Chapman"), the plant's Human Resources Manager, met with Plaintiff and Waddell on March 11th to resolve their issues. Some of the problem stemmed from Plaintiff attempting to present gifts to Waddell, who was married. (Watts Aff.; Chapman Dep. pp. 10-15.) They also advised Owens to avoid getting involved in conversations between other employees because, being a temporary employee, his job was more vulnerable. (Chapman Dep. p. 15.)

Approximately three weeks later, on April 1, 2005, Owens complained to Chapman that Plaintiff grabbed his buttocks twice and attempted to kiss him twice and asked him to go to the elevator to give her a kiss. In his written statement, Owens claimed that the inappropriate touchings occurred on February 26, 2005 in the presence of a co-employee, Andy Griffin ("Griffin"). (Owens Aff.) Griffin substantiated Owens' claim of both in an interview with Watts and in a subsequent written statement.[1] (Watts Aff.) While Owens claimed that the attempted kisses occurred on February 26, 2005, and that one of these was in the presence of another co-employee, Mickie Khan, Khan herself denied being a witness to any

---

[1]Griffin denied all knowledge of the incident when initially interviewed by Watts alone, but admitted to witnessing it when confronted by Owens in Watts office. (Watts Aff. Ex. A.) In written statements made on April 2 and May 10, 2005, Owens claims that after grabbing his posterior on February 26th, Plaintiff asked Owens to grab his, and that on March 26th, Plaintiff had tried to kiss him and asked him to have sex with her after work. (Owens' Decl. Exs. A & B.) When Owens first spoke to Watts, he was not sure of the exact date and only named Griffin as a witness. (Pl.'s Br. Ex. D 000072.)

inappropriate behavior by Plaintiff. (Chapman Dep. pp. 63-64.) In light of these findings, Chapman contacted her superior, Human Resources Manager Rudy Allen ("Allen"), and the two of them interviewed Plaintiff, Owens, and Griffin.

In her April 7, 2005 interview, Plaintiff maintained that, if she had touched Owens' buttocks, she "didn't remember it." (See Pl.'s Dep. pp. 53-54, 72-73.) According to Plaintiff's deposition testimony, Allen responded, "so you're saying you might have done it but you don't remember, and [Plaintiff] said right. If I touched his butt I don't remember." (Id. p. 72.) When Allen told Plaintiff that there was a witness to the incident, Plaintiff immediately identified the witness as Griffin based on her observation that neither Owens nor Griffin were often seen without the other. (Id. pp. 54-55, 74.)

Plaintiff also claims that after her interview with Allen and Chapman, she confronted Griffin, who, according to Plaintiff, implied that he had to make his previous statements to Defendant in order to protect his own job. (See Id. p. 75.) Plaintiff admits that she did not report this conversation with Griffin or any inappropriate conduct on his part to Defendant until after her dismissal from the company. (Id. 76-77.)

At the conclusion of all interviews, Allen consulted Charles Post ("Post"), Defendant's in-house counsel. Post advised Allen that Defendant would terminate a male employee for conduct similar to Plaintiff's. In light of this, Allen, Chapman, and Watts again

met with Plaintiff on April 12, 2005 and informed her that she was being terminated.

Within hours of her termination, Plaintiff called Defendant's Concern Line, a number through which employees may raise work-related issues, and told the operator that Owens and Griffin had been sexually harassing her, rather than she harassing Owens. While Plaintiff told the operator that the two men had repeatedly asked her out and "propositioned her," she did not allege that either man had touched her inappropriately. (Dep. Ex. 33.)

Allen informed Post of Plaintiff's phone call the following day, and Post instructed him to investigate Plaintiff's allegations. Subsequently, Chapman called Plaintiff on April 18, 2005. Plaintiff provided the names of five witnesses during that conversation but did not elaborate on Griffin's alleged conduct. When Chapman and Allen proceeded to interview the five named witnesses, only one, Terrence Moss ("Moss"), claimed that he had seen any untoward behavior by Griffin. Moss first reported there was no harassing behavior, but later remembered that he had seen Griffin grab Plaintiff on her breast and buttocks, although he could not recall when. (Dep. Ex. 14.)

While Defendant's investigation of Griffin was pending, Plaintiff filed a charge of sex discrimination with the Equal Employment Opportunities Commission ("EEOC"), alleging that an unnamed male employee had been accused of sexual harassment but had not been terminated. Neither Post nor Allen knew the identity of the unnamed male employee when they learned of Plaintiff's

-4-

complaint on April 22, 2005. (Post. Dep. pp. 19-20; Allen Dep. pp. 81-82.)

On April 27, 2005, Post, Allen, and Chapman discussed Plaintiff's allegations of sexual harassment against Griffin and their investigation thus far. Post confessed himself "baffled" by the strange circumstances of the case, i.e., that Moss claimed Griffin had grabbed Plaintiffs buttocks and breast while Plaintiff, who brought the complaint, only claimed verbal harassment. (Post Dep. p. 92.) Post concluded that further investigation was necessary. (Id.)

In a May 23, 2005 telephone conversation with Plaintiff and her attorney, Allen learned for the first time that the unidentified male in Plaintiff's EEOC complaint was Steve Smith, an employee whom Plaintiff had not previously identified via the Concern Line. (Post. Dep. pp. 78-79.) Allen also used this conversation to clarify Plaintiff's allegations against Griffin. When he specifically asked Plaintiff if Griffin had done anything inappropriate beyond asking her out, Plaintiff responded that "all he ever did was talk in a way that made her uncomfortable," such as making "comments about her butt." (Dep. Ex. 14.) Following this conversation, Post instructed Allen to reinterview Moss.

The same day, May 23rd, Post first learned details of the complaint against Steve Smith ("Smith"). In Smith's case, a female employee, Melissa Vestal ("Vestal"), reported that, as she stood in the cafeteria on March 23, 2005, Smith approached her from behind, leaned over her shoulder, placed the back of his hand against her

buttocks, and asked if she was feeling okay. (<u>See</u> Jim Smith Aff., Ex. A; Watts Aff., Ex. B.) Vestal downplayed the incident by stating that the touch might have been accidental and that she did not want Smith fired as a result of it. (Jim Smith Aff. ¶ 3; Watts Aff. ¶ 4.) Vestal did, however, feel the need to have the incident documented. (<u>Id.</u>) Notably, Vestal did not identify any witnesses to Smith's conduct at the time of her report. (<u>Id.</u>) Therefore, as a result of Vestal's complaint, Defendant interviewed Smith, who admitted to placing his hand on Vestal's shoulder, but not on her buttocks. (<u>Id.</u>) He offered to apologize to Vestal for any misunderstanding and later received counseling and documentation of the incident in his personnel file. It was not until several days after the counseling that Vestal informed Chapman that a co-worker named Larry O'Neill claimed to have witnessed Smith's earlier conduct. (Chapman Dep. p. 45.) Chapman, noted the existence of a "culture of rumors in a manufacturing environment" and their potential influence on delayed reports, meaning people hear rumors then claim to have seen the incident in order to get even with someone. As a result, she decided not to interview O'Neill at that time. (<u>Id.</u> p. 46.) In hindsight, she said she should have spoken to O'Neill. (<u>Id.</u> p. 48.)

When Post learned, on May 24, 2005, of Chapman's failure to interview O'Neill, he instructed her to reopen the investigation. (Post Dep. pp. 85-87.) At this time, according to Post, there was great confusion. Steve Smith had evidently told Plaintiff about

his problem, which led to "this circle."[2]  On the other hand, Moss was reporting a much more serious incident concerning Plaintiff, than Plaintiff herself reported.  (Id. at 87.)  Chapman subsequently interviewed O'Neill and reinterviewed Vestal.  In his interview, O'Neill described Smith's placement of his hand on Vestal's buttock  as a "pretty slick move" and clearly not accidental.  (Id. p. 89; Dep Ex. 34.)  As a result of this report, Post recommended confirming the earlier statements provided by Plaintiff, Vestal, and their witnesses before proceeding further as to either claim.  Consequently, Plaintiff was reinterviewed by telephone on June 1, 2005, at which point she claimed for the first time that Griffin had grabbed her buttocks.  (Post Dep. pp. 108-109.)  She did not say her breasts were grabbed as well.  (Id.)  Griffin, who was interviewed later, denied grabbing Plaintiff.  (Id. at 119; Dep. Ex. 34.) However, at the conclusion of all interviews, a team of Defendant's officials concluded that Plaintiff, Griffin, and Smith had behaved in "substantially the same" manner, and Griffin and Smith were terminated for their actions. (Post Dep. pp. 111, 119.)

Notably, for each of the three terminated individuals, a different company official signed the paperwork documenting the termination, including that employee's eligibility for rehire. Defendant acknowledges that the paperwork for Smith failed to properly reflect that he, like Plaintiff and Griffin, was

---

[2]Plaintiff said that Steve Smith told her about the Vestal incident and that he did not think she would be fired either. (Pl.'s Dep. p. 83.)

ineligible for rehire, and that Smith was, in fact, rehired by Defendant in July 2006. Defendant terminated Smith for the second time in December of that year after learning of its error from Plaintiff. Plaintiff now claims that Smith's rehiring, along with the delayed and/or lengthier investigations of Smith and Griffin as compared with her own, are evidence of Defendant's discriminatory animus which preclude summary judgment in the present case.[3]

## Summary Judgment Standard

Summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must view the evidence in a light most favorable to the non-moving party. Pachaly v. City of Lynchburg, 897 F.2d 723, 725 (4th Cir. 1990). When opposing a properly supported motion for summary judgment, a party cannot rest on conclusory statements, but must provide specific facts, particularly when that party has the burden of proof on an issue. Id. "The summary judgment inquiry thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, *in the form of admissible evidence*,

---

[3]Plaintiff's brief contains a listing of how Plaintiff, Griffin, and the Smith cases were treated slightly differently. (Pl.'s Br. 7-10.) The differences are without substantive meaning and at times show the males were treated less well, e.g., after Smith's case was closed, he was told his job was not in jeopardy. Yet, it was subsequently reopened and he was fired. Plaintiff contends he was treated more favorably because she was never given this, as it turned out, "false" assurance.

that could carry the burden of proof of his claim at trial."
Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993)
(emphasis added). A mere scintilla of evidence will not suffice.
Rather, there must be enough evidence for a jury to render a
verdict in favor of the party making a claim. Sibley v. Lutheran
Hosp. of Maryland, Inc., 871 F.2d 479, 486 (4th Cir. 1989).

### Wrongful Discharge

In the present case, Plaintiff first claims that she was
wrongfully discharged because of her sex in violation of N.C.G.S.
§ 143-422.2.

> Given the similar language and underlying policy of
> § 143-422.2 and Title VII, 42 U.S.C. § 2000e et seq., the
> North Carolina Supreme Court has explicitly adopted the
> Title VII evidentiary standards in evaluating a state
> claim under § 143-422.2 insofar as they do not conflict
> with North Carolina Statutes and case law.

Hughes v. Bedsole, 48 F.3d 1376, 1383 (4th Cir. 1995)(citing North
Carolina Dep't of Correction v. Gibson, 308 N.C. 131, 301 S.E.2d
78, 82-85 (1983)). Thus, a claimant under either statute can
establish a disparate treatment claim (1) through direct proof of
discrimination or (2) through presumptions by using the burden-
shifting method set out in McDonnell Douglas Corp. v. Green, 411
U.S. 792 (1973). In this case, Plaintiff does not argue that she
has direct evidence to prove gender discrimination. Instead, she
relies on the McDonnell Douglas proof scheme.

Under the rebuttable presumption, burden-shifting model,
Plaintiff must first establish a prima facie case of disparate
treatment. See St. Mary's Honor Center v. Hicks, 509 U.S. 502,

510-511 (1993) (citing <u>McDonnell Douglas</u>, 411 U.S. at 802).  To do so in the disciplinary context, Plaintiff must show by a preponderance of the evidence that (1) she is a member of a protected class, (2) she was charged with engaging in prohibited conduct, (3) her conduct was substantially similar to that of employees outside the protected class, and (4) she was punished for that conduct more severely than employees outside the protected class.  <u>Moore v. City of Charlotte</u>, 754 F.2d 1100, 1105-06 (4th Cir. 1985)(citing <u>Burdette v. FMC Corp.</u>, 566 F. Supp. 808, 815 (S.D. W. Va. 1983)).

The fact that a plaintiff was legitimately disciplined for misconduct does not necessarily preclude recovery based on discrimination.  The key is whether persons not in the protected class engaged in similar misconduct, yet were not punished or received less severe punishments.  <u>Abasiekong v. City of Shelby</u>, 744 F.2d 1055, 1057 (4th Cir. 1984).  If Plaintiff can show this, Defendant, in turn, must show that there was a valid reason for the apparently disparate actions it took regarding her.   <u>Hicks</u>, 509 U.S. at 510.  If such a reason is proffered, Plaintiff must then demonstrate that the apparently valid reason was actually a pretext for illegal discrimination.  <u>Id.</u>  Throughout the <u>McDonnell Douglas</u> test, the burden of proving discriminatory animus remains on Plaintiff.

Defendant does not dispute the fact that, as a female, Plaintiff is in a protected class.  It also concedes that she was discharged for engaging in a prohibited activity, the inappropriate

touching of a coworker. As Defendant points out, however, Plaintiff's chosen male comparators, Griffin and Smith, were also discharged for inappropriate touching. Thus, Defendant argues that Plaintiff cannot establish a prima facie case of discrimination.

Despite the uniform end result of all three investigations, Plaintiff contends that Defendant discriminated against her by handling the investigation which led to her termination differently from those regarding Griffin and Smith. For the first basis for disparity, Plaintiff points to the EEOC finding of discrimination which was solely based on Ms. Chapman's decision not to interview O'Neill. However, Plaintiff admits the EEOC decision is not binding under state law. Moreover, the decision has little to recommend it, being based solely on Ms. Chapman's decision not to immediately interview O'Neill, but ignoring the reasons and the timing behind the decision and the situation. It also ignores the case of Mr. Griffin.

Next, Plaintiff argues that discrimination is proven by the fact that Smith's chart was accidentally not marked "not eligible for rehire." This ignores not only Griffin's case, but also the fact that upon Defendant's learning of the error, Smith was terminated.

Finally, Plaintiff argues that the statements of Defendant's supervisors are contradictory and the procedures arbitrary, so as to favor males accused of inappropriate touching. However, much of the argument is not persuasive because it merely consists of Plaintiff's "opinions," such as "they lobbed softball questions" to

-11-

Smith. (Pl.'s Br. 17.) In a related, but somewhat contradictory and self-defeating argument, Plaintiff contends that Defendant would not have terminated Griffin and Smith at all had she not raised allegations against them following her own termination, including bringing the previous complaint against Smith to Defendant's attention. At that point, Plaintiff claims, Defendant was "compelled" to terminate the men "as a result of an investigation into defendant's conduct" by the EEOC. (Compl. ¶ 15.) In other words, the argument is that Defendant intentionally discriminated against her by terminating her, and then tried to cover it up by discriminating against two males by firing them for substantially the same or lesser reasons.

Unfortunately for Plaintiff, being treated differently does not necessarily mean being treated discriminatorily. Moreover, in some ways, Plaintiff was arguably treated more favorably than the two males. The role of the courts does not include second-guessing managerial decisions, including the manner in which complaints are investigated, however disparate they may appear at first blush. The courts "are concerned only with ensuring that decision-makers are not improperly motivated by discriminatory animus." Mereish v. Walker, 359 F.3d 330, 339 (4th Cir. 2004). Therefore, where disparate discipline is alleged, a plaintiff must show that male employees acted in substantially the same manner, yet received a lesser degree of punishment. See Moore, 754 F.2d at 1106. Such a showing usually requires direct comparisons in order to raise a presumption that Defendant's disparate treatment stemmed from

-12-

Plaintiff's sex rather than from other distinguishing characteristics between the instances. See, e.g., McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 283 n.11 (1976).

While exact symmetry between Plaintiff's situation or actions and those of others is not required, they must be materially similar. See Moore, 754 F.2d at 1107 (misconduct must be of "comparable seriousness" in disparate discipline comparison). It is the task of the Court to assess the relative similarity of conduct or misconduct relied on by the parties at summary judgment and decide whether Plaintiff has submitted sufficient evidence to establish a prima facie case of gender discrimination. Id. More importantly for purposes of this case, it is also the Court's role to assess the relative similarity of the disciplinary actions taken against Plaintiff and her chosen comparators. See, e.g., Maynard v. Bd. of Regents of Div. of Univ. of Fla. Dept. of Educ., 342 F.3d 1281, 1289 (11th Cir. 2003).

Here, Plaintiff first claims that, although both she and Smith were accused on touching a co-worker's buttocks, she was suspended pending an investigation while Smith was not. (Verified Compl. ¶ 8.) This allegation is at odds with the record. In particular, Plaintiff testifies in her deposition that after her initial conversation with Allen and Chapman regarding Owens' accusations, she returned to work. (See Pl.'s Dep. pp. 75-77.) These events occurred on Thursday, April 7, 2005. (Id. p. 71.) Plaintiff was terminated the following Tuesday, April 12, 2005, when she again was called from her job into a meeting with Allen. (Id. pp. 77-

-13-

78.)  Thus, the evidence indicates that Plaintiff continued to work during the investigation of her behavior, not that she was suspended without pay.

Even when the Court extends Plaintiff's claim to encompass other alleged inconsistencies between the investigations, such as the varied lengths and depths of the investigations, Plaintiff still fails to raise any inference of discrimination sufficient to establish a prima facie case.  As the Fourth Circuit has stated:

> [E]stablishing a prima facie case by circumstantial evidence is not a precise, mechanically-imposed formulation.  In each set of circumstances, the burden is on the plaintiff to prove a set of circumstantial facts, which in the absence of a legitimate non-discriminatory explanation, leads one to conclude with reasonable probability that the action taken against him was the product of discrimination.

Cook v. CSX Transp. Corp., 988 F.2d 507, 511 (4th Cir. 1993)(citing Duke v. Uniroyal, Inc., 928 F.2d 1413, 1418 (4th Cir. 1991)).  In this case, the set of circumstantial facts provided by the record as a whole fails to raise such an inference.  In particular, a closer examination of the information available to Defendant at the time each investigation began reveals sizeable discrepancies between the instances themselves which merited disparate treatment.

In Smith's case, the reporting employee, Vestal, specifically stated that the touch might have been accidental and that she did not want Smith fired as a result of it.  Thus, the evidence at first was equivocal to non-existent.  Vestal simply felt the need to have the incident documented in case a similar situation arose in the future.  Plaintiff's accusation against Griffin was even

-14-

less substantial and did not even include a complaint about touching. Owens' accusations against Plaintiff, on the other hand, did not contain any such caveats. Smith's and Griffin's situations also differ from Plaintiff's in that Vestal and Plaintiff did not identify any witnesses to the conduct at the time of their reports. Given that Vestal herself felt that the touching may have been accidental, Defendant had little basis for terminating, or even investigating, Smith, and instead chose to document the incident and counsel Smith against future inappropriate conduct. Owens, in contrast, immediately identified Griffin, who fully substantiated the claim of inappropriate touching soon after the claim arose.

While Plaintiff offers Defendant's initial failure to interview O'Neill, when he later came forward as a witness to Smith's behavior, as evidence of discriminatory conduct by Defendant, this action does not point to any disparity of treatment. The facts are simply different for very understandable reasons, because of the timing of when O'Neill was identified and Vestal's equivocal report. Plaintiff presents no evidence that this error resulted from sex discrimination. Additionally, no one among Defendant's decision-making personnel, other than Keisha Chapman, was even aware of O'Neill's status as a potential witness prior to the time Plaintiff filed her EEOC complaint. While Chapman herself admits that her initial decision not to interview O'Neill was a poor one, it is also understandable given the peculiar facts relating to the Smith situation. Nothing in the record supports an implication that the delay was made with the

-15-

intent to, as Plaintiff alleges, favor male employees over that of females.[4]  More importantly, when Defendant learned in a belated interview with O'Neill that Smith's inappropriate touching of Vestal only "appeared" intentional, Smith, like Plaintiff, was terminated.[5]

The incident regarding Griffin's actions also was not as clear as that of Plaintiff's.  First, there was a disparity between the accounts of witness Terrence Moss, who claimed that Griffin grabbed Plaintiff's breast and buttocks, and Plaintiff herself, who initially and twice alleged that Griffin's harassment was solely verbal.  Even when Allen asked her explicitly whether Griffin's harassment had gone beyond words, Plaintiff replied that it had not.  It was not until her interview on June 1, 2005, approximately six weeks after her initial complaint, that she first made an allegation of any physical improprieties by Griffin.  As in Smith's case, Griffin was terminated for this behavior.  Again, if anything, Griffin was treated more harshly than Plaintiff because, like the Smith incident, the "victim" initially denied any untoward touching and then was allowed to change her mind.

In contrast to both Smith and Griffin's cases, where serious allegations, witnesses, and key information emerged later and at

---

[4]Plaintiff particularly fails to explain why a decision (1) not to interview a male witness (2) made solely by a female human resources manager should be viewed as discrimination against females.

[5]If anything, Smith was arguably treated somewhat more harshly than Plaintiff because the Smith "victim" was unsure and equivocal about the incident, while Plaintiff's "victim" was not.

differing times, Plaintiff's case involves a clear allegation of intentional, inappropriate touching in the presence of at least one corroborating witness. Whether Plaintiff's accuser and/or witness were lying or had reason to lie, as she suggests, is outside the scope of this Court's inquiry.[6] The Court's only concern is whether Plaintiff has proffered sufficient proof that any disparate treatment on the part of Defendant was the result of discriminatory animus. In light of the facts before the Defendant-employer at the time of its decisions, it is clear that Plaintiff cannot meet this burden.

Plaintiff's related argument, that Griffin and Smith would not have been terminated at all absent her complaints, also fails to raise any inference of discrimination. As discussed above, an employer is only responsible for the information before it at the time of its decisions. Here, there was no reason for Defendant to investigate, let alone terminate, Griffin prior to the time Plaintiff made her initial allegations on the Concern Line. While Plaintiff claims in her brief that Defendant failed to respond to her earlier complaints about Griffin, this allegation is, like

_____

[6]The overriding issue is not whether Defendant made a bad decision, but whether the decision was based on Plaintiff's gender. In any event, such an inquiry would require the Court to examine Plaintiff's own retaliatory motives, as well as those of Griffin and Owens. It is admittedly suspicious that Owens voiced his allegations of sexual harassment on April 1, 2005, three weeks after he accused Plaintiff of making racist comments, despite the fact that the inappropriate touchings allegedly occurred several weeks prior to either report. However, Plaintiff also places her own motives in question by making her first report of sexual harassment against Griffin only after he served as a witness against her.

several of her other contentions, wholly unsupported by the record, and immaterial to the issue before the Court.

Plaintiff never reported Griffin's behavior to anyone in Defendant's management other than her group leader, Jackie Weatherman ("Weatherman") prior to her termination. (Pl.'s Dep. p. 61-62.) Plaintiff does not indicate that she told Weatherman about any inappropriate touching; she simply told him that Griffin needed "to lighten up, [and] watch what he says." (Id. p. 62.) Further, she admits that she expressly asked Weatherman not to refer the matter to her supervisor, Watts, and that after Weatherman spoke with Griffin, Griffin left her alone. (Id.) And, finally, Plaintiff initially did not report any touching. Only later, when it was in her interest to do so, did she change her story, and even that story was inconsistent with that of the very vague story of the so-called witness. These circumstances simply do not reflect an employer who was dismissive of Plaintiff's complaints, let alone one who harbored discriminatory animus against females.

Smith's case does not provide Plaintiff with any material help either. As discussed previously, Defendant admits that its initial failure to interview O'Neill, a potential witness, could be seen as an error, but understandable, taking into account the "victim's" own equivocal report. This lone factor does not come close to providing the foundation for a prima facie case of sex discrimination. Therefore, this claim must be dismissed.

## Intentional Infliction of Emotional Distress

Defendant next contends that Plaintiff cannot maintain her claims for intentional infliction of emotional distress ("IIED") and negligent infliction of emotional distress ("NIED"). In order to survive summary judgment as to IIED, a plaintiff must demonstrate that the defendant engaged in (1) extreme and outrageous conduct (2) which is intended to cause and does cause (3) severe emotional distress. <u>Hogan v. Forsyth Country Club Co.</u>, 79 N.C. App. 483, 487-488, 340 S.E.2d 116, 119 (1986). In the present case, Plaintiff fails to sufficiently demonstrate both the first and second of these elements.

The North Carolina courts have defined "extreme and outrageous conduct" as "conduct [which] exceeds all bounds usually tolerated by decent society." <u>Beck v. City of Durham</u>, 154 N.C. App. 221, 231, 573 S.E.2d 183, 191 (2002)(citations omitted). "It is a question of law for the court to determine, from the materials before it, whether the conduct complained of may reasonably be found to be sufficiently outrageous as to permit recovery." <u>Hogan</u>, 79 N.C. App. at 490, 340 S.E.2d at 121. To survive summary judgment, Plaintiff must provide non-conclusory admissible evidence supporting her claims.

"North Carolina courts have been extremely reluctant to find actionable IIED claims in the employment context, and termination, allegedly in violation of federal law alone, does not necessarily constitute extreme and outrageous conduct under North Carolina law." <u>Efird v. Riley</u>, 342 F. Supp. 2d 413, 427 (M.D.N.C.

-19-

2004)(citations omitted). "'Furthermore, under North Carolina law, acts of discrimination are not necessarily 'extreme and outrageous.'" Id.(citing Frazier v. First Union Nat'l Bank, 747 F. Supp. 1540, 1553 (W.D.N.C. 1990). While Plaintiff offers the Hogan case as evidence that a successful IIED claim can exist within the employment context, this reliance is misplaced. ( See Pl.'s Br. 24.) In Hogan, the court found sufficient evidence of extreme and outrageous behavior where the plaintiff was "subjected to non-consensual sexual touchings, constant suggestive remarks and on-going sexual harassment." 79 N.C. App. at 491, 340 S.E.2d at 121. This decision was in no way based on the plaintiff's subsequent termination or other discriminatory practices by her employer. Here, in contrast, the sole basis for Plaintiff's IIED claim, as set out in her complaint, is Defendant's gender-based employment discrimination.[7] (Compl. ¶ 25.) This allegation of discrimination alone, even if true, simply cannot rise to the level of extreme and outrageous behavior. See Thomas v. N. Telecom, Inc., 759 F. Supp. 2d 627, 635 (M.D.N.C. 2000); Atkins v. USF Dugan, Inc., 106 F. Supp. 2d 799, 810-811 (M.D.N.C. 1999); Parsadini v. Rack Room Shoes, 912 F. Supp 187, 192 (M.D.N.C. 1996).

---

[7]In her memorandum in opposition to Defendant's motion, Plaintiff for the first time implies that her IIED claim is based on Griffin's alleged harassment of her during her employment with Defendant. However, no such basis for recovery appears in her complaint, and Plaintiff has offered no admissible evidence to support this new allegation. Her own statements in that regard are contradictory, and evidence exists that she herself engaged in harassment of others, indicating the type of conduct and work environment she found acceptable. Last, even if Plaintiff could successfully show extreme and outrageous behavior, her IIED claim still fails as to causation.

-20-

Plaintiff's IIED claim also falters on the causation element. In her complaint, Plaintiff claims that she suffered severe emotional distress, "including worry, sleepless nights, nightmares, and depression" as a result of her termination and Defendant's discriminatory conduct. (Compl. ¶ 26.) She also claims to have seen a psychiatrist regarding these symptoms "within days" after her discharge. (Id.) While these claims may support a finding that Plaintiff suffered severe emotional distress, other factors in the record call into question whether, or at least to what degree, Plaintiff's symptoms were caused by Defendant's actions. Plaintiff's deposition reveals that she "had problems with depression and anxiety for a number of years prior" to her termination and that she had been taking prescription medications for those conditions for several years prior to being terminated. (Pl.'s Dep. p. 139.) Nothing in her deposition or elsewhere in the record indicates that these pre-existing conditions worsened as a result of her termination. Without evidence establishing either causation or that Defendant's actions were intentional, extreme, and outrageous, Plaintiff's IIED claim cannot succeed, and summary judgment is appropriate.

### Negligent Infliction of Emotional Distress

Similar problems eviscerate Plaintiff's NIED claim. In order to establish such a claim, Plaintiff must show that Defendant (1) negligently engaged in conduct, (2) which would reasonably and foreseeably cause Plaintiff's severe emotional distress, and (3) which did, in fact, cause severe emotional stress. Pardasani, 912

-21-

F. Supp. at 192. Normally, termination of employment, even where it is wrongful, is insufficient to alone sustain a claim of NIED. While the Court disagrees with Defendant's assertion that wrongful termination is always by nature intentional, and therefore outside the scope of a negligence claim, see, e.g., Bumgardner v. Spotless Enterprises, Inc., 287 F. Supp. 2d 630, 638 (W.D.N.C. 2003)(supervisors may negligently terminate an employee by relying on improper information when deciding to discharge him), a plaintiff claiming NIED must still prove that her employer should have realized that its conduct involved an unreasonable risk of causing emotional distress, Johnson v. Ruark Obstetrics and Gynecology Assocs., P.A., 327 N.C. 283, 304, 395 S.E.2d 85, 97 (1990). She must also show that her employer was aware that such distress might result in her illness or bodily harm. Id. Here, however, Plaintiff has offered no evidence of Defendant's awareness beyond the bare accusations in her complaint. Her negligent infliction claim also shares a common failing with her IIED claim, i.e., nowhere has she demonstrated a causal relationship between her termination and her alleged mental distress. For these reasons, the Court will grant Defendant's motion for summary judgment as to this claim as well.

**IT IS THEREFORE ORDERED** that Defendant's motion for summary judgment (docket no. 44) is granted and that this action is dismissed.

_Russell A. Eliason_
**United States Magistrate Judge**

March 27, 2008

-22-